GAIL SHIFMAN (SBN 147334)
Law Office of Gail Shifman
2431 Fillmore Street
San Francisco, CA 94115
Tel:    (415) 551-1500
Email: gail@shifmangroup.com

Attorney for Defendant
MARIO CRUZ-CALIX

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>MARIO CRUZ-CALIX,<br><br>     Defendant. | Case No.  CR 23-00148-1 YGR<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>DATE: November 16, 2023<br>TIME: 9:00 a.m. |

## I.      INTRODUCTION

Defendant Mario Cruz-Calix is scheduled to appear for sentencing following his plea of guilty to one count of conspiring to distribute and possess with intent to distribute Fentanyl in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B)(iv).  Defendant asks the Court to impose a sentence of time served, which at the time of sentencing will be two weeks shy of one year in custody.  With good time credits, one year in custody is the equivalent of a 14-month sentence of imprisonment, a sentence sufficient, but not greater than necessary to comply with 18 U.S.C. § 3553(a).

Defendant has no objections to the calculation of the sentencing guidelines as contained in the Presentence Report ("PSR") with a total offense level of 21 and a Criminal History Category III, for a guideline range of 46 to 57 months.  Defendant notes only a minor correction in the PSR

DEFENDANT'S SENTENCING MEMORANDUM        1

in paragraph 1, correcting the date that Mr. Cruz-Calix was charged in the Northern District of California to May 5, 2021, ECF, Dkt. 1.

Mario Cruz-Calix, ("Mario") 27 years old, comes before the Court following his involvement with his wife, Yeni Fernandez-Ryes, and others in this offense. Fernandez-Reyes received a concurrent sentence of 27 months imprisonment in Case No. CR 22-0178 YGR, for her involvement in the same activities that Mario has been charged in this case, which occurred on April 30, 2021 and May 10, 2021, and in a second federal case, CR-0250 YGR, where she was charged separately with six drug distribution counts including one count of distribution of heroin, and five counts of possession with intent to distribute fentanyl. Significantly, she committed the offense charged in CR 22-0178 YGR, while she was on pretrial release in her separately charged drug case. Given Ms. Fernandez-Reyes' additional significant conduct for which she was sentenced, Mario submits that imposing a sentence of time served for him avoids unwarranted disparity under § 3553(a)(6). Additionally, a time served sentence contemplates a variance for his unstable upbringing in Honduras, his lack of education caused by the family's poverty that resulted in his leaving school at the age of 13 years to work in the agricultural fields and the overstatement of his criminal history, as described below.

Mario regrets his involvement in this offense and upon release and return to Honduras plans to make better choices including finding work that will enable him to make a living either through a barbershop business or as a mechanic. PSR ¶ 55.

## II. BACKGROUND – HISTORY AND CHARACTERISTICS OF DEFENDANT

Mario grew up in a small village in poverty in Honduras. Living conditions were abysmal; while there was running water in the village proper, there was no electricity until 2004. Candles were used for lighting; fire was used for cooking. Throughout Mr. Cruz-Calix's upbringing, his neighborhood was surrounded with gangs. PSR ¶ 49.

**DEFENDANT'S SENTENCING MEMORANDUM        2**

While the PSR deceptively describes Mario's home as an "open concept design", PSR ¶ 50, suggesting a home that might be found in Danville, in fact it was a shack, shanty-type home where 'walls' were created by his mother cleverly putting up plywood as separation for bedrooms. Though he grew up in a supportive household, and was not subject to abuse in his home, the family's poverty resulted in Mario dropping out of school at the age of 13 to go work in the fields with his father. PSR ¶ 51.

At the age of 16 years old, Mario lost his maternal grandmother who was the maternal figure in his life. This loss was difficult for him to bear. That same year, at 16 years old, Mario became a father to the first of his two children, now aged 12 and 8 years old, living in Hayward. He is close with both children and before his incarceration, he saw them regularly. He still communicates with them often. PSR ¶ 52.

Fearful for his life in Honduras, "I was afraid, I was going to get killed. I did not want to lose my life and now look at me," Mario came to the U.S. Knowing that he must plan for a better, safer life, with the support of his close family, in Honduras he hopes to work either as a mechanic or to open a barbershop business. PSR ¶¶ 53, 55.

These mitigating factors, including his acceptance of responsibility for his conduct, his history of instability and trauma as a child; his lack of education and abject poverty may be considered under 18 U.S.C. § 3553(a) as reasons for the Court to impose a time served sentence. These factors include,

**The Overstatement of Mario's Criminal History Category**

This Court can depart downwards to Criminal History Category III because Criminal History Category III substantially overstates the seriousness of Mario's criminal history. The Court can also find under §3553(a) that the nature of Mario's criminal history and the actual sentences he served provide a basis for a further variance below the guideline range.

**DEFENDANT'S SENTENCING MEMORANDUM        3**

Downward departures for overstatement of criminal history are explicitly endorsed by the federal sentencing guidelines. *See* USSG § 4A1.3(b)(1). Such departures are warranted when the criminal history category "substantially over-represents" the seriousness of the defendant's criminal history. *Id.*

While Mario may not initially appear a strong candidate for this departure, a close examination of his record, however, reveals that he is a far cry from the typical defendant in Criminal History Category III.

The PSR indicates that Mario has previously been convicted of two misdemeanors, a Wyoming misdemeanor for Unlawful Possession of a Controlled Substance in 2020, PSR ¶ 37, and a California misdemeanor for Giving False Information to a Police Officer in 2022, PSR ¶ 38. For these two misdemeanor convictions, the PSR scores Mario's criminal history points as four (4), giving two (2) points for each conviction stating that Mario was sentenced to 12 months jail in Wyoming and 64 days jail in California. The PSR states that records for these convictions were not received.

Despite not having the records for these convictions, the PSR (¶ 37) determines that the Wyoming misdemeanor should be scored at 2 points because a 12-month jail sentence entry appears, apparently, listed on a RAP sheet. And, despite not knowing whether there was any attorney representation of the defendant in the Rock Springs, Wyoming court, the PSR oddly justifies the convictions inclusion in the Report because California law requires that people accused of felonies and misdemeanors have attorney representation or intelligently waive such a right pursuant to California Penal Code § 987. Such justification cannot, and is not, applicable to a Wyoming misdemeanor conviction.

Nor is a presumed entry on a RAP sheet a substitute for a review of the actual court records. Importantly, it should be noted that the date of arrest in Rock Springs, Wyoming is listed as September 22, 2020, the **exact** date that a sentence of 12 months jail was allegedly imposed. We know that Mario could not have served a sentence of 12 months jail or anything even close to a year or even resembling

**DEFENDANT'S SENTENCING MEMORANDUM        4**

a sentence with credits for good time given that he was charged with being an Alien Present without Admission or Parole on October 1, 2020 (meaning that he was in ICE custody by this time) and *deported* on October 23, 2020.  PSR ¶ 41.

Even with the lower burden of proof at sentencing, by a preponderance, it cannot be reliably determined that this Wyoming misdemeanor conviction should result in the imposition of two (2) criminal history points, let alone included as a conviction that should be considered as a part of the criminal history score calculation.  Given the lack of confirming court records, it is unknown if  the conviction is even constitutionally valid.  And, if a constitutionally sound conviction, without confirming court records, it is not certain what sentence was actually imposed given that Mario could not have served more than 9 days of custody time for the misdemeanor before finding himself in ICE custody.

As a result of these deficiencies, Defendant submits that the Wyoming conviction should not be included or scored in the calculation of criminal history points.  And, certainly, if scored, given the paucity of confirming court records and the actual time served, should not be scored more than one (1) criminal history points under U.S.S.G. § 4A1.1(c).

With regard to the California misdemeanor conviction, here too, the criminal records of conviction were not received and hence, not reviewed.  Presumably, because this is a California conviction, the defendant had counsel present in the courtroom.  However, we know that he could not, and did not serve a 64-day jail sentence because he was arrested on October 28, 2022 for the misdemeanor and in federal custody on the instant offense 34 days later on December 1, 2022.  PSR ¶ 38 and Release Status, P.1.

The typical Criminal History Category III defendant is not perched there because of two misdemeanor convictions for which he served a total of 43 days in custody for those offenses. It is impossible to conclude anything other than defendant's criminal history is significantly overstated by category III for these two misdemeanors.  As a result, Defendant submits that the Court find that the

**DEFENDANT'S SENTENCING MEMORANDUM        5**

appropriate criminal history category is I, for an adjusted guideline range of offense level 21, Criminal History Category I, 37 to 46 months before varying further under § 3553(a) on other grounds.

**Disadvantaged Childhood**

Disadvantaged childhood and lack of guidance as a youth are factors that district courts are free to consider under *Booker* and its progeny as part of the § 3553(a) analysis. *See United States v.Ruiz*, 2009 WL 636543 (S.D.N.Y. March 11, 2009) (judge imposed 96 months rather than guideline range 140-175 months for crack offenses in part due to defendant's difficult childhood with abusive mother and largely absent father who was incarcerated and a heroin addict); *United States v. Patzer*, 548 F.Supp. 2d 612 (N.D. Ill. 2008) (court imposed sentence of 13 years, despite Guidelines range of 346-411 months, finding that defendant's prior offenses designating him as a career offender were less serious than most of such offenses considered for purposes of that guideline, had difficult childhood, not property diagnosed with ADD, his conduct stemmed from mental health and drug problems that were treatable, and that he had potential for rehabilitation with support of friends and foster family).

Here, Mario endured a difficult and unstable childhood growing up in abject poverty, little education, and surrounded by gangs.  He has suffered and endured an environment that made it difficult for him to find an easy path forward in life resulting in the poor choices that he made in this case.  He knows that he cannot continue on this path and has committed to a simple working life in Honduras.

**The Refusal of the Bureau of Prisons to Grant a Reduction of Custodial Time for Successful Completion of the Residential Drug Treatment Program**

During his probation interview, Mario candidly admitted his serious drug use.  While the Bureau of Prisons may permit Mario to participate in a drug treatment program, it will not allow a reduction in his custodial sentence to reward his successful completion of the program.

In 1990, Congress first created the structure for residential substance abuse treatment for federal prisoners. *See* 18 USC § 3631. To increase participation in the program, in 1994 Congress created an incentive of a sentence reduction of up to one year for successful completion of this

program. *Id.* at § 3621(e). Under the authorizing statute, this sentencing reduction is only available to non-violent offenders. The program ultimately created by the Bureau of Prisons is called the "Residential Drug and Alcohol Program," or "RDAP."

While there is nothing in the statute that excludes deportable aliens from participating in the RDAP program and receiving a reduction in their sentence, the B.O.P. has created a requirement of community confinement at the end of the term. Because aliens with ICE detainers cannot be released to community confinement at the end of their term they cannot "complete" RDAP – and thus are all denied the one-year sentence reduction given to non-alien inmates who complete the program. *See* Stephen Sady & Lynn Deffebach, *The Sentencing Commission, the Bureau of Prisons, and the Need for Full Implementation of Existing Ameliorative Statutes to Address Unwarranted and Unauthorized Over-Incarceration*, June 2008, at 11, available at http:// or.fd.org/symp2.final% 20for%20pdf.pdf.

Thus, Mario cannot receive the one-year reduction granted to nonalien inmates for successful completion of "RDAP."  When imposing a sentence, this Court must consider the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 USC § 3553(a)(2)(D). It must also seek to avoid "unwarranted sentence disparities among defendants with similar records." *Id.* at § 3553(a)(6). The Bureau of Prison's refusal to grant the RDAP one-year reduction incentive to alien inmates does not provide "correctional treatment in the most effective manner," and promotes disparities between alien and non-alien defendants who complete the RDAP process. This Court can accordingly recommend that Mario participate in the RDAP program and can vary downward from the guideline range under Section 3553(a), to arrive (with the other departures and variances urged) at a time-served sentence.

**DEFENDANT'S SENTENCING MEMORANDUM        7**

**CONCLUSION**

For these reasons, Mario asks the Court to impose a sentence of time served with the supervised release conditions as contained in the PSR.

Dated: November 9, 2023

Respectfully submitted,

*/s/ Gail Shifman*

_____
GAIL SHIFMAN
Attorney for Defendant
Mario Cruz-Calix

**DEFENDANT'S SENTENCING MEMORANDUM        8**